Patrick M. Flatley
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:                                        )
                                              )
ANTHONY LEE DAVID and                         )
CHRISTINA LEE DAVID,                          )     Case No. 18-bk-377
                                              )
                    Debtors.                  )     Chapter 13
                                              )
_____              )
                                              )
ANTHONY LEE DAVID,                            )
CHRISTINA LEE DAVID, and                      )
ROBERT GLUS,                                  )
                                              )
                    Plaintiffs,               )
                                              )
        v.                                    )     Adversary No. 18-ap-29
                                              )
ROBERT MICHAEL HAYWOOD,                       )
d/b/a THE MIKE HAYWOOD GROUP,                 )
                                              )
                    Defendant.                )
_____              )

## MEMRANDUM OPINION

Pending before the court are cross motions for summary judgment regarding the adversary complaint filed by the Plaintiffs against the Defendant.  Specifically, the Defendant has filed a motion for summary judgment as to all seven counts, while the Plaintiffs seek summary judgment as to Counts II, IV, V, VI, and VII.  For the reasons stated herein, the court will grant and deny each in part.

## I. BACKGROUND

This proceeding emanates from two real estate transactions that occurred more than a decade ago.[1] In 2007, Chapter 13 debtors Anthony and Christina David (the "Debtors") purchased from R. Michael Haywood (the "Defendant") ten-plus acres identified as 117 Dragonfly Lane, Elk Garden, West Virginia. Their purchase was pursuant to a land sale contract (the "2007 Contract"), which had an interest rate of 9.75% and called for thirty-five monthly payments of $1,288.73 and a final balloon payment for the unpaid balance. According to the Defendant, he ultimately declared the 2007 Contract void in April 2008 based upon the Debtors' payment default. Despite the opportunity to walk away from the purchase, the Debtors expressed continued interest in acquiring the property. Notably, however, they were unable to obtain traditional financing.

Given the Debtors' difficulty obtaining traditional financing, the Defendant owner-financed their subsequent purchase for $149,000 (the "2008 Contract"). Like the 2007 Contract, the 2008 Contract carried an interest rate 9.75%, and it called for fifty-nine monthly payments of $1,280.14 and a final installment of $144,932.55. The balloon payment was due July 1, 2013.[2] Both contracts included late fees of $50. At closing, which occurred at the office of Charles W. Smith, Esq., the Defendant conveyed the property to the Debtors, Robert Glus, Mrs. David's father, (collectively with the Debtors, the "Plaintiffs"), and Donald B. David.[3] To secure the Plaintiffs' performance under the 2008 Contract, the Defendant recorded a deed of trust and obtained from

---

[1] The record includes information regarding a third transaction—the Debtors' 2011 purchase of five acres adjoining the property the property they purchased in 2007 and again in 2008. Notably, it does not appear that the Plaintiffs seek relief against the Defendant related to the 2011 transaction. In fact, the court perceives this adversary proceeding to revolve around only the parties' 2008 transaction.

[2] The due date used by the court is as alleged in the Plaintiffs' complaint and admitted by the Defendant in his answer. Notably, however, the Plaintiffs also assert in their complaint that "new documentation" delayed the payment of the balloon payment until July 1, 2014. The Defendant denies that allegation. The court is unaware based upon its review of the record what comprises the "new documentation" referenced by the Plaintiffs. The Plaintiffs did not direct the court's attention to it, and the court did not observe it on its own.

[3] The Plaintiffs sought leave to amend their complaint to add Mr. Glus as a party-plaintiff in response to the Defendant's motion to dismiss based upon his failure in that regard. On August 8, 2018, the court ordered that Mr. Glus be added as a Plaintiff in this adversary proceeding. The court is unaware who Mr. Donald David is such that the court simply notes for factual accuracy his role as a party to the deed transferring the subject property.

the Plaintiffs an executed deed in lieu of foreclosure for use in the event that they defaulted. The deed in lieu, although executed soon after the closing of the 2008 transaction, was never recorded.

At some point, seemingly in 2011, the Defendant began efforts to collect the debt based upon the Plaintiffs' purported delinquency on the 2008 Contract. Notably, however, the Defendant's efforts in that regard waned if not stopped in 2012, but the Defendant declared a default on the 2008 Contract in 2013. In conjunction therewith, the Defendant communicated with the Plaintiffs many times, including by letters in 2014 and 2015. During the fall of 2015, the Defendant increased his collection efforts seeking to exercise his rights under the deed in lieu of foreclosure. On October 1, 2015, the Plaintiffs notified the Defendant that they obtained legal counsel and requested that all further communication be directed through counsel. Thereafter, the Defendant abandoned his remedy under the deed in lieu of foreclosure, and the Plaintiffs filed a civil action against the Defendant in the Circuit Court of Mineral County, West Virginia (the "State Court Action").[4] Ultimately, the Defendant noticed a foreclosure sale to occur on June 23, 2017, and the Debtors' filed their voluntary Chapter 13 petition on April 25, 2018.

The Plaintiffs filed the adversary proceeding that is now before the court on June 15, 2018, pleading the seven counts detailed below. (Doc. #1.) The Defendants have filed a motion for summary judgment as to all seven counts (Doc. #45), while the Plaintiffs have filed one as to Counts II, IV, V, VI, and VII (Doc. #86, #87-1).

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure ("Rule") 56, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is only appropriate if the movant demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment must make a prima facie case by showing: first, the apparent absence of any genuine dispute of material fact; and second, the movant's entitlement to judgment as a matter of law on the basis of undisputed facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of proof to establish that there is no genuine dispute of material fact. *Celotex Corp. v.*

---

[4] Notably, the Plaintiffs' complaint here is essentially identical to the State Court Action. It is unclear to the court why the Plaintiffs filed an identical action here as opposed to continuing with the State Court Action. Despite their claims being property of their bankruptcy estate, the court is unaware of anything—like the automatic stay, for instance, in a creditor's suit against a debtor—the precludes them from prosecuting their action in state court.

*Catrett,* 477 U.S. 317, 325 (1986). Demonstrating an absence of any genuine dispute as to any material fact satisfies this burden. *Id.* at 323. Material facts are those necessary to establish the elements of the cause of action. *Anderson*, 477 U.S. at 248. Thus, the existence of a factual dispute is material — thereby precluding summary judgment — only if the disputed fact is determinative of the outcome under applicable law. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). A movant is entitled to judgment as a matter of law if "the record as a whole could not lead a rational trier of fact to find for the non-movant." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (citation omitted); *see also Anderson*, 477 U.S. at 248.

If the moving party shows that there is no genuine dispute of material fact, the nonmoving party must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. *Celotex Corp.*, 477 U.S. at 322-23. The court is required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Shaw,* 13 F.3d at 798. However, the court's role is not "to weigh the evidence and determine the truth of the matter [but to] determine whether there is a need for a trial." *Anderson*, 477 U.S. at 249-50. Nor should the court make credibility determinations. *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). If no genuine issue of material fact exists, the court has a duty to prevent claims and defenses not supported in fact from proceeding to trial. *Celotex Corp.*, 477 U.S. at 317, 323-24.

### III. ANALYSIS
### A. COUNT 1

Count I demands equitable reformation of the 2008 Contract on the basis of the unconscionability of the underlying contract and the Defendant's alleged unconscionable inducement in its formation.[5] The Plaintiffs allege inequality of bargaining positions, with the Plaintiffs as unsophisticated consumers who were first-time home buyers and the Defendant as an extensive real estate owner and seller who had been selling through similar financing agreements. They argue that contract was an adhesion contract drafted by the Defendant and that they were never given time to read or understand it. They allege an absence of a meeting of the minds based on, *inter alia*, a failure to disclose a large balloon payment, a large late payment charge of $50 per occurrence, and a "cognovit forfeiture clause" that permitted the Defendant to unilaterally accomplish a foreclosure without any process protecting them as buyers. On this count, only the

---

[5] Although the 2008 Contract is not expressly referred to as such in Count I, the court reasonably infers it is the subject of said count.

Defendant has filed a motion for summary judgment, asserting first that the count is barred by the equitable doctrine of laches and second that the Plaintiffs have failed to demonstrate entitlement to relief based upon unconscionability.

Insofar as the Defendant's argument for judgment based upon laches is concerned, the court denies it. The court agrees with the Plaintiffs that the Defendant's argument is deficient in articulating the legal and factual elements supporting judgment in this case. The Defendant's arguments are merely conclusory. The court is thus unable to premise judgment upon laches. *See Barber v. Magnum Land Services, LLC*, 2014 WL 5148575, at *12 (N.D. W. Va. Oct. 14, 2014) (setting forth the requisite elements and burden regarding the defense of laches and the type of findings sufficient to predicate summary judgment upon).

Turning next to the issue of unconscionability, the applicable legal principles have been summarized as follows:

> We examine the issue of unconscionability pursuant to the approach set forth in *Brown I*. "Under West Virginia law, we analyze unconscionability in terms of two components parts: procedural unconscionability and substantive unconscionability." 228 W.Va. at 681, 724 S.E.2d at 285. To conclude that a contractual term is unenforceable on grounds of unconscionability requires a finding that the provision in issue "is both procedurally and substantively unconscionable." *Id.* at 658, 724 S.E.2d at 262, syl. pt. 20, in part. And, as we observed in *Brown I*, "[t]he burden of proving that a contract term is unconscionable rests with the party attacking the contract." *Id.* at 680, 724 S.E.2d at 284.
>
> A. Procedural Unconscionability
>
> . . . .
>
>> Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract. Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction. These inadequacies, include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract.
>
> 228 W.Va. at 657, 724 S.E.2d at 261.
>
> . . . .
>
> As this Court explained in *Brown I*, the focus of substantive unconscionability is on the nature of the contractual provisions rather than on the circumstances surrounding the contract's formation:

> Substantive unconscionability involves unfairness in the contract itself and whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party. The factors to be weighed in assessing substantive unconscionability vary with the content of the agreement. Generally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns.
>
> 228 W.Va. at 658, 724 S.E.2d at 262, syl. pt. 19.

*Nationstar Mortg., LLC v. West*, 785 S.E.2d 634, 638, 641–42 (W. Va. 2016) (omissions added).

As to the procedural-unconscionability requirement, the Defendant contends that summary judgment is appropriate because the evidence shows that, having lived in the property for at least a year before they signed the promissory note and deed of trust at issue, the Plaintiffs had to be well aware of any dilapidated condition of the residence before signing the June 2008 Contract containing an "as is" clause. In fact, they deferred maintenance and repairs until they renegotiated the land-installment contract to a mortgage-purchase contract under which they held title.[6] Moreover, the Plaintiffs admitted in their depositions that, although they had concerns over the high interest rate, they thought that overall the deal and the price were fair. Additionally, the Defendant points to the inclusion of Christina David's father, Robert Glus, as a third borrower because he has various credentials (auto dealership experience, prior residential purchase and financing experiences, and an accounting degree) that tend to exclude the group from the unsophisticated-consumer classification. Mr. Glus also demonstrated in a deposition his knowledge of and familiarity with the balloon payment, its due date, and its amount. Thus, overall, the Defendant asserts that these facts demonstrate some bargaining power and the Plaintiffs' ability to comprehend the transaction.

As to the substantive-unconscionability requirement, the Defendant contends that summary judgment is appropriate because, whatever the original contract said, the evidence clearly shows that the default under the deed of trust was actually enforced, before bankruptcy, by means of the statutory nonjudicial foreclosure procedures in West Virginia rather than by a unilateral recording of the deed in lieu of foreclosure. He also points to the admission by Christina David that the

---

[6] Notably, the Plaintiffs signed and delivered to the Defendant the deed in lieu of foreclosure *before* any event of default. The court is unsure what effect upon title or the rights of the parties results from the deed's execution, and the parties have not addressed it; however, it is noted for the record at this time.

Plaintiffs were unable to refinance the balloon payment under the contract because of their own circumstances rather than any particular actions by him that prevented the same. Overall, the Plaintiffs received the benefit of acquiring title to their home, while the Defendant was unable to use the asset's equity in another business transaction. They wanted to remain living on the premises and were able to do so. The Defendant even worked with the Plaintiffs to help them realize the benefit of the transaction by extending the balloon payment from three years to five years.

The Plaintiffs counter that the evidence is undisputed in showing both substantive and procedural unconscionability. With respect to the latter, they stress the fact that the dates on the closing documents were spread throughout a period of four weeks, which even the Defendant found confusing. They also point to deposition testimony indicating the Defendant was responsible for all drafting, the Plaintiffs lacked a chance to make modifications to terms and did not have an adequate opportunity to discern and understand the documents.

With respect to substantive unconscionability, the Plaintiffs again stress the presence of an unenforceable deed in lieu of foreclosure provision as well as evidence supporting the claim that the deal was infeasible and designed to result in forfeiture of the property. They testified to the string of initial high payments with a high interest rate culminating in the due date for the balloon payment, while the Defendant did not access their credit reports and did not verify their income, taxes, and bank account data to determine whether the payments were feasible. Additionally, they claim that the real estate purchase had dubious value from their perspective, because the previous rental price for the house, which was in a dilapidated condition and in need of repair, was $200 per month, while the monthly mortgage payments were $1,288.73. Finally, they point to evidence that the Defendant paid a $50 document-preparation fee when he purchased the property, but he then charged the Plaintiffs $510 for the same item. If one draws all inferences in favor of the Plaintiffs, one could interpret the situation as designed to expect and ensure the purchasers' ultimate default on the sale and forfeiture of the residential property back to the seller, while the seller effectively collected rent far in excess of the $200 per month that they had previously been paying.

Overall, the evidence pertaining to the various unconscionability factors weighs in both directions to some degree. Construing the facts in the light most favorable to the Plaintiffs at this point and drawing all reasonable inferences in their favor leads inexorably to the denial of the

Defendant's motion for summary judgment.  Given the competing evidence and the limited parameters of summary judgment, the court cannot weigh the evidence and assess the credibility of the parties at this stage of the proceedings.  Although the ultimate question of whether the facts rise to a level of unconscionability recognized by West Virginia is a legal determination for the courts, summary judgment cannot be granted where there are underlying disputes as to what the facts show and, consequently, to what degree each factor pertaining to unconscionability is present. *Herrod v. First Republic Mortg. Corp., Inc.*, 625 S.E.2d 373, 379 (W. Va. 2005).  Thus, a trial on the issue is necessary.

## B. COUNT II

In Count II, the Plaintiffs plead an "illegal transaction" based upon the Defendant conditioning the sale and deed-of-trust transactions on the execution of a deed in lieu of foreclosure that could have resulted in the Plaintiffs' forfeiture of their property interests at the whim of the Defendant, without due process of law, which in West Virginia consists of a particular statutory process utilized by a trustee under a deed of trust.  The parties have filed for cross motions for summary judgment on this count.  The Defendant stresses that he never actually used or enforced the deed in lieu of foreclosure.  The Plaintiffs point out that the Defendant threatened to utilize the option when they were delinquent, and the option was not legally viable.

The unenforceability of such clauses is allegedly based on the holding in *A.B. Farquhar Co. v. Dehaven*, 75 S.E. 65 (W. Va. 1912).  Under the common law as ascertained in West Virginia, a Defendant's confession of judgment by various means is valid only within a judicial proceeding involving service of process; outside of court proceedings, "where there has been no appearance by the Defendant," advance confession-of-judgment documents are deemed valid only to the extent provided by "positive law," i.e., by legislative enactment.  *Id.* at 67-68.  The proposition advanced by the Plaintiffs is a defensive principle of law that was, for example, used in *A.B. Farquhar Co. v. Dehaven* to ultimately declare "that a judgment by confession in the clerk's office, on warrant of attorney, without process regularly issued and served upon or accepted by Defendant is void on its face."  *Id.* at 69.  But this was only <u>after</u> a judgment in the state circuit court based upon such confession had triggered an execution and a motion to quash it, which should have been granted according to the West Virginia Supreme Court of Appeals' holding.  *Id.* at 65, 69.

Here, the evidence is undisputed that the deed in lieu of foreclosure (the cognovit forfeiture agreement) was never actually utilized.[7]  Rather, in Count II, the Plaintiffs pled a cause of action based on its mere existence.  More importantly, the Plaintiffs failed to establish as a legal matter that a tort or other private right of action exists for having merely required the execution of such a document as part of a mortgage loan transaction and the availability of damages for such a violation.  Understandably, they include this aspect of the sale transaction to demonstrate unconscionability.  But that is a separate count, Count I, based on a range of facts and circumstances and an established body of law.  Here, the Plaintiffs plead a cause of action based on nothing more than the document's existence, have not put forth any evidence that it was enforced or resulted in damages, and, most importantly, have not established as a matter of law that an "illegal transaction" is a recognized private cause of action in West Virginia in and of itself – as opposed to a defense against enforcement of such a transaction.

For the foregoing reasons, the court will deny the Plaintiffs' motion for summary judgment as to Count II and grant the Defendant's motion for summary judgment.

## C. COUNT III

In Count III, the Plaintiffs plead that the financing of the real estate sale transaction (again without specifying which contract in the series) was in violation of the applicable usury law, W. Va. Code § 47-6-5(b), in that the stated interest rate of 9.75% was in excess of the maximum rate of 8% for a "contract in writing."  *Id.*

Like Count I, only the Defendant seeks summary judgment on this count.  As a basis therefor, the Defendant raises the Lending and Credit Rate Board statutory provisions, W. Va. Code § 47A-1-1(f) to (g), which provide for, as an alternative to the statute cited by the Plaintiffs, a maximum interest rate of 18% in West Virginia according to the most recent order of the West Virginia Lending and Credit Rate Board.  Recent case law supports this position:

> Mr. Cunningham cites West Virginia Code section 47–6–5(b), which provides as follows:
>> Parties may contract in writing for the payment of interest for the loan or forbearance of money at a rate not to exceed eight dollars upon one hundred dollars for a year, and proportionately for a greater or less sum,

---

[7]  The Plaintiffs pled a separate cause of action based on the threat to utilize the advance deed in lieu of foreclosure in Count VI.  The court resolves the viability of that specific claim later in this opinion.

> or for a longer or shorter time, including points expressed as a percentage of the loan divided by the number of years of the loan contract.

W. Va.Code § 47–6–5(b). There is a more recent statutory enactment, however, that must be considered. West Virginia Code section 47A–1–1 created the West Virginia Lending and Credit Rate Board ("Board"). The Board is authorized

> to prescribe semiannually the maximum interest rates and finance charges on loans, credit sales or transactions, forbearance or similar transactions made pursuant to this section subject to the provisions, conditions and limitations hereinafter set forth and to authorize lenders, sellers and other creditors to charge up to the maximum interest rates or finance charges so fixed. The rates prescribed by the board are alternative rates and any creditor may utilize either the rate or rates set by the board or any other rate or rates which the creditor is permitted to charge under any other provision of this code.

*Id*. The most recent rate setting executive order by the Board, dated October 5, 1999, directs as follows:

> As an alternative to any statutory rate, any person [which defined in West Virginia Code § 31A–1–2(n) means "any individual, partnership, society, association, firm, institution[ ], company, public or private corporation, state, governmental agency, bureau, department, division or instrumentality, political subdivision, county court, municipality, trust, syndicate, estate or any other legal entity whatsoever, formed, created or existing under the laws of this State or any other jurisdiction"] may charge a maximum finance charge not exceeding eighteen percent per annum calculated according to the actuarial method, on all loans, credit sales or transactions, forbearance or similar transactions, regardless of purpose.
> This Order is effective December 1, 1996 and, pursuant to West Virginia Code § 47A–1–1(g), shall remain in full force and effect until such time as the Board meets and prescribes different maximum rates of interest and/or maximum finance charges.

(W. Va. Exec. Ord. at 2 (Oct. 5, 1999), available at http://www.dfi.wv.gov/about/ Documents/WVLendingandCreditRateBoardOrder Oct1999.pdf). The maximum applicable interest rate on the note is thus 18%.

*Cunningham v. LeGrand*, 2013 WL 2484344, at *3–*4 (S.D. W. Va. June 10, 2013) (alterations in original) (Executive Order of October 1999 is currently found at https://dfi.wv.gov/about/Pages/WestVirginiaLendingandCreditRateBoard.aspx).

The Plaintiffs attempt to circumvent the effect of § 47A-1-1 by raising the so-called time-price doctrine. The Plaintiffs argue that issues of fact as to the sale transaction's characterization under this doctrine prevent summary judgment in favor of the Defendant on the usury issue and relying on *Carper v. Kanawha Banking & Tr. Co*., 207 S.E.2d 897 (W. Va. 1974). In *Carper*, a jury had returned a verdict against both the seller and financing bank, finding that a finance charge

10

of $3,128 amounted to "an effective simple interest rate" of 11.23% for the purchase of a mobile home, which was in excess of the 8% rate permitted by statute. *Id.* at 904-06. On appeal, the seller and lender argued that the West Virginia Supreme Court of Appeals should apply the time-price doctrine to the transaction as a matter of law, thereby exempting the transaction from usury and avoiding the jury verdict. The court rejected this plea, stating that "all parties admit that the contract in question was legal only if this Court had recognized the time-price doctrine to be a valid exception as a *matter of law* to the usury statute. From the treatment of the main issue *supra*, it should be apparent that we do not choose to so sanctify the time-price doctrine, and but for the assertion of the doctrine, the contract sued upon in this case would have been patently usurious." *Carper*, 207 S.E.2d at 918 (italics in original). In light of the *Carper* court's disapproval of the doctrine, the extent to which it survives as a usury exception is limited to the facts of particular cases as determined by the trier of fact. The *Carper* court was satisfied to leave in the hands of the jury the question of "whether, under the facts of the entire commercial transaction[,] it was a bona fide sale of personal property protected by the limited confines of the time-price exception, or a usurious cover," *id.*, and it determined that the plaintiff had offered sufficient evidence to the jury to sustain the verdict of usury, *id.* at 912-14.[8]

Addressing the question of what burden of proof applied to the usury question, the court further held that when a financing agreement involves usury on its face, the plaintiff's burden of proof is simply by a preponderance of the evidence. *Id.* at 917-18. The court then found that because the financing agreement was patently usurious, the lower burden of proof was appropriately used as part of the jury instructions. *Id.*

Nevertheless, the *Carper* court continued to analyze contracts that facially appear to involve legal interest rates and created a different burden of proof for those transactions:

> Factually where a contract containing deferred payments on its face provides for charges which do not exceed lawful interest under the usury statute, there properly should be afforded a presumption of regularity to such instrument. Under those facts, the proof of usury by parol or otherwise to overcome the presumption of regularity of the contract should be strong; a clear and satisfactory preponderance of the evidence standard is certainly warranted.

---

[8] The time-price doctrine has been extended to both real and personal property sale transactions. *Stonebraker v. Zinn*, 286 S.E.2d 911 (W. Va. 1982).

*Carper*, 207 S.E.2d at 917.  In the case at bar, the transaction on its face involves a sale price for real estate at a rate of 9.75%, which is within the legal limit permitted by § 47A-1-1(g).  Thus, the contract receives a presumption of regularity, and any parol proof of usury must meet the heightened burden of proof to overcome the presumption and establish usury.

As to the factual issue of "whether a questioned transaction was usurious—or a bona fide sale of personal property saved by the time-price doctrine," the Plaintiffs cite the portion of the opinion identifying the issue as such and setting forth four factors for identifying which of the two categories applied to the facts at hand.  *Id.* at 910-12.  In that section, the *Carper* court summarized the time-price factual issue as follows:

> In other words, within the contemplation of the parties contracting, if they deem or intend a sale of personal property to be based upon a cash price coupled with contemporaneous or subsequent arrangements to finance the balance of the sale, the terms of which provide for a total amount due greater than the cash price with legal interest, then the factual issue arises.

*Carper*, 207 S.E.2d at 911.  Similarly, the court also stated that "[i]f the negotiation between the seller and the buyer involves a bona fide quotation of both a cash price and a credit price, the transaction does not involve usury, even though the quoted credit price is such as to exceed the cash price plus lawful interest thereon."  *Carper*, 207 S.E.2d at 910.  Essentially, the exception recharacterizes any interest payments on the purchase of real or personal property as being part of the principal sum—or the price.  *Stonebraker v. Zinn*, 286 S.E.2d 911, 916 (W. Va. 1982).  By means of this recharacterization, the transaction does not qualify as a "loan of money" or a "forbearance" within the scope of the usury law, W. Va. Code § 47-6-5(b), because any interest on the transaction is deemed to involve the negotiated contract price of an item being sold.  *Stonebraker*, 286 S.E.2d at 916-17.

As a direct negotiation of a sale price for real estate, two-party land-installment contracts were deemed to fall within the time-price exception to usury as early as the late 1800s.  *Stonebraker*, 286 S.E.2d at 916-17.  Thus, buyers under land-installment contracts do not receive protection under usury law.  Instead, any protection against excessive interest is handled holistically under an equity doctrine examining whether a buyer's default on such a contract results in an excessive forfeiture of the amounts paid up until the default; in disfavoring forfeitures, its compares the total amounts retained by the vendor (which necessarily include some interest payments) to the fair rental value of the property, plus all damages that the vendor incurred as a

12

result of the breach and remarketing expenses of the property.  *Stonebraker*, 286 S.E.2d at 914-15,
917.

As to the scenario at bar involving the 2008 Contract,[9] dicta in *Stonebraker* indicates that
this second transaction is not covered by the time-price exception, which means that it *is* subject
to examination under ordinary usury law.  In a footnote, *Stonebraker* distinguishes a sale of real
property accomplished by means of a note and a deed of trust (and also the conversion of a land-
installment contract into the same) from a land-installment contract for purposes of the time-price
doctrine; furthermore, a sale of real property accomplished by means of a note and a deed of trust
can be found to violate usury law.  *Stonebraker*, 286 S.E.2d at 916 n.8.  This result logically follows
from the simple fact that the note secured by a deed of trust is technically a "loan" rather than a
purchase contract, in contrast to a land-installment contract, and a "loan" is subject to ordinary
usury-law analysis.  Here, the 2008 Contract converted the failed 2007 Contract into a traditional
transfer of title accompanied by a note secured by a deed of trust, which is not covered by the time-
price exception to usury.  Ordinary usury analysis, however, does not appear to demand the
searching factual inquiry required by the time-price doctrine because, as noted above, the 2008
Contract does not facially implicate an usurious rate in West Virginia and is thus presumptively
legal and regular under *Carper*.

In this case, the Plaintiffs are raising the time-price doctrine to avoid summary judgment
in favor of the Defendant, and there are two problems with this attempt.  First, the Plaintiffs'
attempt at raising the doctrine is curious because, in doing so, its application would exempt the
transaction from the usury law in West Virginia, which would defeat the point of pleading usury
in the complaint in the first place.  Rather, the Plaintiffs raise the doctrine to manufacture an issue
of fact (based on certain language in *Carper*) to avoid what would otherwise be the Defendant's
clear entitlement to summary judgment on the count pertaining to usury.  But, if the doctrine
applies, it defeats a usury claim.  If it does not apply, then there is no "exception" to the usury law,

---

[9]  Application of the time-price doctrine to the initial 2007 Contract would have taken the
transaction outside of usury for purposes of adjudicating Count III.  Any examination of the fair
rental value of the property relative to the payments, as urged by the Plaintiffs, would have required
a different legal theory under equity as applied to contractual forfeiture, as occurred in
*Stonebraker*.  *Id*. at 917.  But we are not presented with a land-installment contract in this case;
the Plaintiffs never suffered a forfeiture under such a transaction.  Rather, the 2008 Contract
superseded the 2007 Contract, resulting in a promissory note and deed of trust transferring title to
the Plaintiffs.

which means that the court is simply dealing with the ordinary form of usury law and analysis without the doctrine (typically statutory construction and application, as done above).  As stated, a transaction involving a sale of real property at an annual interest rate of 9.75% does not violate usury law in West Virginia.

The second problem with the Plaintiffs' use of the doctrine is that there is no underlying evidence to implicate the doctrine in this particular case, other than to manufacture a factual issue to avoid summary judgment.  The evidence and deposition testimony do not indicate that the Plaintiffs ever negotiated and elicited a bona fide quotation of both a cash price and a credit price -- with the quoted credit price exceeding the cash price plus lawful interest thereon -- and had a choice between the two.  The evidence does not indicate that they ever intended to pay cash for the property and that they, therefore, negotiated a separate cash price that was distinct from the overall price of $149,000 being financing at a legal rate of 9.75% as set forth in the relevant documents.  (Doc. # 87-3, Ex. B, June 16, 2008, Promissory Note.)  Additionally, there is no evidence that as to the credit price, the total to be collected was greater than the cash price plus the legal rate of interest (plus 9.75%), including no expert analysis of the Defendant's amortization schedule showing a contradictory view.  Consequently, there is no evidentiary basis to implicate the time-price doctrine as a threshold matter in this case.  Curiously, in their recharacterization of the transaction, the Plaintiffs include the $76,230 they made in post-purchase remodeling and repairs to their property, but they have not supported this addition with any requirement under usury law (or any law governing credit transactions generally) to the effect that the interest rate or purchase price is increased by post-purchase renovations paid to someone other than the seller or lender.

Simply put, the Plaintiffs are reaching for a deeper factual analysis of the land sale at issue. The problem with their approach and argument is that one could take literally every transaction involving financing and hypothesize a scenario raising a usury issue by simply characterizing any given transaction in more than one way.  For instance, one could lower the price of any good or service and offset the same by raising the interest rate to a usurious level until the total amount paid was the same in both scenarios.  To avoid the possibility of litigating any and every financing transaction for usury in response to mere assertion, more evidence is required where the financing documents do not facially present any usury issue.

14

For the forgoing reasons, this rate was not usurious under West Virginia law, and, accordingly, the Defendant is entitled to summary judgment on Count III.

## D. COUNT IV

The Plaintiffs plead Counts IV, V, VI, and VII pursuant to the West Virginia Consumer Credit and Protection Act (the "WVCCPA"). As a threshold issue, the Defendant contends that the Plaintiffs are not consumers covered by the WVCCPA, given that, in the previous state-court litigation involving the same or similar claims under that statute, the Defendant's attorney "argued that the Plaintiffs had conceded this was not a 'Consumer Loan' and thus Counts V, VII, and VIII of the Complaint should be dismissed as a matter of law." (Doc. #45, Ex. 21.) Then, as a result of the Plaintiffs' attorney informing the state court that they would withdraw Counts VII and VIII, the Circuit Court of Mineral County "dismiss[ed] Counts VII and VIII of the Complaint, with prejudice" on December 7, 2017. The Defendant argues that the concession requires an application of judicial estoppel that bars the Plaintiffs from being considered a "consumer" under the WVCCPA, which he asserts affects the viability of the last four counts of the present complaint. The Plaintiffs do not address judicial estoppel but instead set forth the general applicability of the WVCCPA to cases such as the present one based on the terms of the statute and the applicable case law.

Judicial estoppel bars a party from changing positions if that party has prevailed with that position in prior litigation, meaning that "the prior inconsistent position must have been accepted by the court." *Lowery v. Stovall*, 92 F.3d 219, 223-24 (4th Cir. 1996). Even assuming that judicial estoppel applies to the inapplicability of "consumer loan" under the WVCCPA, the provisions at issue in Counts IV, V, VI, and VII—namely § 46A-2-124, § 2-127, and § 2-128—relate to collection generally and have a wider applicability than transactions limited to a "consumer loan" as a result of § 46A-2-122, which utilizes a special series of definitions for the eight specified sections of Article 2:

(a) "Consumer" means any natural person obligated or allegedly obligated to pay any debt.
(b) "Claim" means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or service which is the subject of the transaction is primarily for personal, family or household purposes, whether or not such obligation has been reduced to judgment.
(c) "Debt collection" means any action, conduct or practice of soliciting claims for collection or in the collection of claims owed or due or alleged to be owed or due by a consumer.

15

(d) "Debt collector" means any person or organization engaging directly or indirectly in debt collection. . . .

W. Va. Code § 46A-2-122.  Furthermore, any conclusion that the land-sale and related deed-of-trust transaction between the parties does not qualify as a "consumer loan" is not fatal to the Plaintiffs' use of the particular portion of the WVCCPA at issue herein.  Thus, the scope of the state court dismissal does not affect or limit the viability of the causes of action brought by the Plaintiffs in this case, since they are relying on separate and distinct provisions of the WVCCPA.

Turning to Count IV, the Plaintiffs plead that the Defendant violated § 46A-2-127 by misrepresenting the due date of the balloon payment as well as the balance due, including the amount in default and related fees.  The WVCCPA provision provides:  "No debt collector shall use any fraudulent, deceptive or misleading representation or means to collect or attempt to collect claims or to obtain information concerning consumers," and this includes "[a]ny false representation or implication of the character, extent or amount of a claim against a consumer." W. Va. Code § 46A-2-127.  The parties have filed cross motions for summary judgment on this count.

In general, this count pertains to a variety of disputes over how much was due and when it was due.  The evidence submitted on these issues is either conflicting or could permit multiple inferences.  For instance, one issue is whether the Defendant made an innocent error in stating that the due date for the balloon payment was two weeks earlier than scheduled (before ultimately extending the due date), or whether the same should be characterized as "fraudulent" and "deceptive" within the meaning of the statute.  At one point, the Defendant allegedly misrepresented the amount due as $145,000 plus interest rather than $144,932.55, but the language "somewhere around $145,000" on page twenty of the Plaintiffs' motion may itself indicate that the amount was an estimate on its face rather than a misleading specific demand amount.  The Defendant's evidence includes a specific amortization schedule for all payments as well as the Grant County Bank account history of payments made.  (Doc. #45, Ex. Nos. 27-28.)  Additionally, plaintiff Christina David admitted in a deposition that she did not have any proof that they had not actually been credited for every payment made.  On the other hand, the Plaintiffs point to deposition testimony indicating that two payments were not deposited in the Grant County Bank and not reflected in the corresponding statements.

16

Due to the conflicting evidence and multiple inferences that the evidence permits, the court must deny both cross motions for summary judgment on Count IV.

### E. COUNT V

In Count V, the Plaintiffs pled that the Defendant violated § 46A-2-127 of the WVCCPA by charging at least twenty-one unauthorized late fees of $50 each. The WVCCPA provision provides: "No debt collector shall use any fraudulent, deceptive or misleading representation or means to collect or attempt to collect claims or to obtain information concerning consumers," and this includes "[a]ny representation that an existing obligation of the consumer may be increased by the addition of attorney's fees, investigation fees, service fees or any other fees or charges when in fact such fees or charges may not legally be added to the existing obligation." W. Va. Code § 46A-2-127(g). The parties have filed cross motions for summary judgment on this count.

The Defendant charged the $50 late fees for payments beyond the tenth day of each month. (Doc. #87-3, Ex. J, K.) The original 2007 Contract provided that a monthly installment payment that was not received by the end of the 15th calendar day after its due date would incur a late fee of $50. (Doc. # 45, Ex. 22.) However, the Defendant declared the original land-installment contract void due to the defaults in 2007 to 2008, according to the terms of the agreement. Then, the June 16, 2008, promissory note for $149,000, which was part of the subsequent 2008 Contract, provided a due date of the first of every month for each installment payment, with a payment being late if the full amount was not paid "by the end of 10 calendar days after the date it is due," and again incurring a $50 fee. (Doc. # 87-3, Ex. B.)

Because the Plaintiffs rely on the late-fee clause from the original, voided land-installment contract rather than the renegotiated, current agreement involving the deeded property, promissory note, and deed of trust, they have applied the wrong trigger date for the late fee. Thus, the Defendant's response to the Plaintiffs' motion for summary judgment correctly determined that the proper time frame for the late fees was the 10th calendar day after the due date. (Doc. # 93 at 6.) The Defendant, therefore, did not charge late fees before he was legally able to do so for late payments under the 2008 secured sale contract and promissory note.

Finally, as to the issue of whether the $50 late fee should have legally been capped at $30, the Plaintiffs very briefly reference § 46A-3-112 of the WVCCPA, which, unlike § 46A-2-127 quoted above, involves Article 3 rather than Article 2. Article 2 has its own special definitional provisions, as set forth in § 46A-2-122, that applies only to specified sections of the Article listed

17

in 2-122, including § 46A-2-127.  In contrast, the $30 cap in § 46A-3-112, being part of Article 3, only applies to "a precomputed consumer credit sale or consumer loan, refinancing or consolidation."  W. Va. Code § 46A-3-112(1).  Rather than being defined in Article 3, however, a "consumer credit sale" and a "consumer loan" are defined in the general definitional section of the WVCCPA, § 46A-1-102(13) and (15).  Both definitions require that the financing, credit, or loan to the consumer debtor be extended "by a seller who regularly engages as a seller in credit transactions of the same kind," in the case of a "consumer credit sale," or be extended "by a person regularly engaged in the business of making loans," in the case of a "consumer loan."  W. Va. Code § 46A-1-102.

As discussed previously, in the parties' state-court litigation involving similar claims under this same statute, the Defendant's attorney "argued that the Plaintiffs had conceded this was not a 'Consumer Loan' and thus Counts V, VII, and VIII of the Complaint should be dismissed as a matter of law." (Doc. #45, Ex. 21.)  Then, as a result of the Plaintiffs' attorney informing the state court that they would withdraw Counts VII and VIII, the Circuit Court of Mineral County "dismiss[ed] Counts VII and VIII of the Complaint, with prejudice" on December 7, 2017.  However, the Plaintiffs' attorney specifically maintained that the land sale constituted a "consumer credit sale."  This contention appears to be related to the deposition testimony of the Defendant to the effect that he engaged in seller-financed land sales approximately twelve times over the course of fifteen years.  (Doc. #87-3, Ex. A at 57-66.)  The number and frequency of such activity could lead to differing inferences on the issue of whether the Defendant was engaged in a "consumer credit sale" by regularly selling property through the type of credit transaction used initially in this case, namely, a land-installment contract.  Thus, the applicability of the "consumer credit sale" definition in § 46A-1-102 is a factual issue requiring development in this case, and that determination will, in turn, affect whether § 46A-3-112 also applies to limit the late fee that a creditor can charge to $30.  In turn, the maximum late fee that can be charged will be determinative on the original question of whether a violation of § 46A-2-127 of the WVCCPA has occurred in Count V.

Due to the differing inferences that the deposition evidence permits, the court must deny both cross motions for summary judgment on Count V.

## F. COUNT VI

18

In Count VI, the Plaintiffs assert that the Defendant violated § 46A-2-128 by threatening to use and record the aforementioned advance deed in lieu of foreclosure (cognovit forfeiture) and also by refusing to substantiate certain specifics about the loan debt in response to written demands for an account history.  The applicable provision provides, "No debt collector may use unfair or unconscionable means to collect or attempt to collect any claim."  W. Va. Code § 46A-2-128.  The parties have filed cross motions for summary judgment on this count.

The Defendant's primary response on this count is that he never actually utilized the deed in lieu of foreclosure.  Rather, he commenced an actual foreclosure proceeding in 2017.  It is not entirely clear whether the mere existence of this document at the inception of the deed-of-trust transaction is enough to trigger a cause of action for unfair/unconscionable debt-collection activity under § 46A-2-128.  The Plaintiffs, however, counter the Defendant's argument with additional authority that is more specific than § 46A-2-128.  For the first time in this case, as part of their reply brief, the Plaintiffs raise § 46A-2-124(f) in support of Count VI:

> No debt collector shall collect or attempt to collect any money alleged to be due and owing by means of any threat, coercion or attempt to coerce. Without limiting the general application of the foregoing, the following conduct is deemed to violate this section: . . . .
> (f) The threat to take any action prohibited by this chapter or other law regulating the debt collector's conduct.

W. Va. Code § 46A-2-124.  Thus, § 46A-2-124(f) specifically renders "[t]hreats or coercion" of "any action prohibited by . . . other law regulating the debt collector's conduct" actionable.  According to the Plaintiffs, when the Defendant threatened by letter on three occasions (September 11, 2015; October 14, 2015; and October 18, 2015)[10] to use the deed in lieu of foreclosure, such conduct constituted a "threat to take [an] action prohibited by . . . other law regulating the debt collector's conduct."  W. Va. Code § 46A-2-124.  This statutory cause of action is more specifically intertwined with the issues here regarding the deed in lieu of foreclosure.  In this new statutory context, the Defendant's defense that the deed in lieu of foreclosure has never been enforced or filed with the county clerk (and consequently did not cause any actual damages) appears to be unavailing.

---

[10] The Plaintiffs suggest a fourth letter dated September 28, 2015, also constitutes an impermissible threat.  However, upon review by the court, no such threat can be discerned.

First, to the extent that Count VI also raises issues concerning the Defendant's alleged refusal to substantiate certain specifics about the account history, it is largely redundant of Count IV. Count IV raises the issue of exactly how much was due and when those amounts were due after the Plaintiffs eventually made monthly payments late and defaulted on the loan. The court previously addressed Count IV and sees no need to discuss it further here except to say that the cross motions on this aspect of Count VI must be denied.

Plaintiffs' other basis for relief in Count VI harkens back to the court's discussion of Count II. As stated previously, the problem with Count II is that simply pleading that the Defendant obtained or held an unenforceable deed in lieu of foreclosure as a sort of advance confession of judgment without process does not state any particular common-law or statutory cause of action. Here in Count VI, however, the WVCCPA creates a private right of action, W. Va. Code § 46A-5-101, and, as the Plaintiffs point out, § 46A-2-128 renders unfair or unconscionable forms of debt collection actionable.

The pertinent legal issue is thus the legality of the Defendant's alleged threats to invoke and use the advance deed in lieu of foreclosure (the cognovit provision) in the 2008 Contract, especially in light of the Plaintiffs' heavy reliance on *A.B. Farquhar Co. v. Dehaven*, 75 S.E. 65 (W. Va. 1912). "The cognovit is the ancient legal device by which the debtor consents in advance to the holder's obtaining a judgment without notice or hearing, and possibly even with the appearance, on the debtor's behalf, of an attorney designated by the holder." *D. H. Overmyer Co. Inc., of Ohio v. Frick Co.*, 92 S. Ct. 775, 777 (1972). The U.S. Supreme Court has explained that a confession of judgment is entered by the clerk of the court as a ministerial, and not judicial, function, followed by execution on the judgment. *Swarb v. Lennox*, 92 S. Ct. 767, 769 (1972) (explaining the statutory cognovit system in Pennsylvania). Further, it has held "that a cognovit clause is not, per se, violative of Fourteenth Amendment due process," a voluntary and knowing waiver of rights to "prejudgment notice and hearing" being constitutionally permissible at the federal level. *D. H. Overmyer Co. Inc., of Ohio v. Frick Co.*, 92 S. Ct. 775, 783 (1972).

At the state level, the states' responses to this rather controversial commercial mechanism have run the gamut of possibilities: "Some States specifically authorize the cognovit. Others disallow it. Some go so far as to make its employment a misdemeanor. The majority, however, regulate its use and many prohibit the device in small loans and consumer sales." *D. H. Overmyer*

*Co. Inc., of Ohio v. Frick Co*., 92 S. Ct. 775, 778 (1972) (footnotes omitted); *e.g., Swarb v. Lennox*, 92 S. Ct. 767, 769 (1972) (describing cognovit regulation by state statute)

In more restrictive states, the limitations on cognovit provisions extend specifically to judicial mortgage foreclosure cases. A judicial foreclosure action may in some instances alleviate any problem that might have existed as a result of an invalid cognovit provision in a mortgage note. *E.g., St. Francis Sav. & Loan v. Zietz,* 333 N.W.2d 733 (Wis. Ct. App. 1983). Since a promissory note and a mortgage are normally deemed two separate (albeit intertwined) contracts, cases in states where cognovit clauses are legal have drawn a distinction between a cognovit provision waiving procedural rights in a promissory note versus one in the mortgage contract; furthermore, only a cognovit provision in the mortgage contract itself can relieve the mortgagee of the need to utilize foreclosure procedures to apply the security to the delinquent debt. *Cent. Natl. Bank v. Gwinn*, 2012 WL 626255, at *5–6 (Ohio App. 4th Dist. Feb. 22, 2012); *Cent. Natl. Bank v. Hines*, 2012 WL 3834780, at *2–3 (Ohio App. 4th Dist. Aug. 28, 2012). A cognovit provision in the promissory note alone is insufficient to waive procedural requirements for foreclosing on the mortgage, which is a separate cause of action. *Id.*

Rather than being allowed but regulated and limited by statute in West Virginia, a cognovit provision waiving all process and notice is generally prohibited as a result of *A.B. Farquhar Co.*, 75 S.E. 65 (W. Va. 1912). Instead, the rule governing confession of judgment is as follows:

> In any action or suit instituted by process a defendant may, in the vacation of the court, and whether the action or suit be on the court docket or not, confess a judgment or decree in the clerk's office for so much principal and interest as the plaintiff may be willing to accept a judgment or decree for. The same shall be entered of record by the clerk in the order book, and be as final and as valid as if entered in court on the day of such confession, . . . .

W. Va. Code § 56-4-48; *see also* W. Va. Code § 50-4-10(c). In other words, confession of judgment can occur in West Virginia at the option of the defendant *following service of process*.

However, because in this case we are dealing with a real estate transaction and, importantly, West Virginia is a nonjudicial foreclosure jurisdiction, the advance deed in lieu of foreclosure may not actually pose a confession-of-judgment problem under *Farquhar*. When the nonjudicial foreclosure procedures in West Virginia were challenged on state and federal due process principles and public policy grounds, the court in *Dennison v. Jack* distinguished the rule in *Farquhar & Co. v. Dehaven*, 75 S.E. 65 (W. Va. 1912), stating, "We do not, however, find the

procedure reviewed in *Farquhar* comparable to the foreclosure procedures involved in the actions before this Court, and, in any event, the petitioners in the actions before this Court have, regardless of the relief they seek in these actions, ample access to the courts by way of injunctive relief or an action to set aside the foreclosure sale, as indicated above." *Dennison v. Jack*, 304 S.E.2d 300, 310 (W. Va. 1983). This distinction of course follows from the simple fact that an ordinary confession of judgment is filed with a court (either in compliance with or contravention of that state's law), but nothing of similar legal import is or need be filed with the court in West Virginia to accomplish the objective of foreclosure.[11] Rather, as *Dennison* indicated, due process occurs by means of a different mechanism in that particular context: namely, the debtor-buyer files an action in equity to enjoin an impending foreclosure sale plagued by legal deficiencies or to set one aside after the fact. *Id.* In the context of enforcing a deed of trust, the secured creditor is not required to file anything with the circuit court of the relevant county, whereas an ordinary creditor on a simple contract would be required to file a complaint and accomplish service of process prior to resorting to confession of judgment.

Specifically, a secured creditor is required to follow the West Virginia statute regulating mortgage foreclosure when vindicating its interest under a deed of trust. Typically, then, an advance deed in lieu of foreclosure held by a traditional mortgagee also holding a deed of trust is problematic, not from the standpoint of *Farquhar* but from the standpoint of the statute regulating mortgage foreclosure, but because the advance deed in lieu of foreclosure involved does an end-run around the nonjudicial foreclosure statute itself. The West Virginia Code provisions from § 38-1-1a through § 38-1-17 unambiguously set forth the requisite procedures and the exclusive remedy in this state for foreclosing against a mortgagor pursuant to a deed of trust, many of which are nullified by the recording of a pre-existing deed in lieu of foreclosure.

---

[11] The nonjudicial foreclosure-sale procedure does, at the periphery, involve the state court system to some extent by including a requirement that the trustee "shall, within two months after the sale," return "to the clerk of the county court of the county wherein such deed may have been first recorded, an inventory of the property sold and an account of the sale," and such clerk is required to maintain the account reports in a bound volume. W. Va. Code §§ 38-1-8 & -9. When the grantor under a deed of trust is the person occupying the property as a residence, the post-sale report filed by the trustee contains many additional, specific requirements. W. Va. Code § 38-1-8a. The grantor under a deed of trust can require the trustee to produce a bond, as approved, filed, and recorded by the clerk of the county court; if the trustee fails to so produce, the circuit court may appoint another trustee, who must also meet the bond requirement. W. Va. Code §§ 38-1-10, -11, & -12.

Of initial importance, the relevant statute states that "[t]his article shall apply to deeds of trust that convey real property or some interest therein or both real property or some interest therein and personal property." W. Va. Code § 38-1-1a. Except to the extent that Article 9 of the U.C.C. governs conveyances of personal property by deed of trust as a security interest, "[i]n all other respects this article is applicable to the conveyance of real property by deed of trust." *Id.* The trustee under a deed of trust must publish a notice of sale with specified information and serve the same on the grantor by certified mail, and "[e]xcept as expressly provided in this section, no trust deed shall waive the requirements of publication of notice required by this section." W. Va. Code § 38-1-4. The statute further mandates, "Prior to the commencement of any foreclosure or other execution of the deed of trust, the original deed of trust shall be recorded." W. Va. Code § 38-1-2. A lien of a vendor of real estate must have "expressly reserved on the face of the conveyance" the lien securing the unpaid portion of the purchase price. W. Va. Code § 38-1-1. After the prescribed notice of sale, default in payment, and the occurrence of any other conditions precedent in the deed of trust, the secured creditor can require the trustee to sell the relevant property at a public auction. W. Va. Code § 38-1-3. Application of the sale proceeds is further regulated by the statute, and a failure to realize fair market value at a foreclosure sale is not a defense available to any interested party. W. Va. Code § 38-1-7. Specialized rules govern a sale of real property subject to an existing tenancy and to remaining personal property of the previous owner. W. Va. Code § 38-1-16; § 38-1-17 ("The notice required by this section [with respect to remaining personal property] may not be waived before the property is vacated."). In the context of recognizing that arbitration clauses restricting mortgagors' litigation rights are not unconscionable, while mortgagees are excepted from the arbitration restriction when it comes to a foreclosure case, *Nationstar Mortgage, LLC v. West*, 785 S.E.2d 634, 642 (W. Va. 2016), recognized that "the need for compliance with statutory foreclosure procedures explains a lack of mutuality in certain loan agreements." *Id.*

Considering the record before the court in light of the foregoing, the court finds that neither party is entitled to summary judgment on Count VI. First, the Plaintiffs did not introduce § 46A-2-124(f) as support for Count VI until their June 21, 2019 reply in support of their motion, which was the last brief filed by anyone regarding summary judgment. Before then, only § 46A-2-128 was at issue, and that provision is far less specific when it comes to evaluating a factual scenario in which a creditor threatens to use a legally unenforceable contract. A party generally cannot

obtain or avoid summary judgment based on a new, unpled theory of the case; that is, a "plaintiff
may not, through summary judgment briefs, raise the new claims . . . because plaintiff did not raise
them in his complaint, and did not file an amended complaint."  *Sharp v. Rosa Mexicano, D.C.,*
*LLC*, 496 F. Supp. 2d 93, 97 n.3 (D.D.C. 2007) (citing *Gilmour v. Gates, McDonald and Co*., 382
F.3d 1312, 1315 (11th Cir. 2004); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996);
and *Fisher v. Metro. Life Ins. Co*., 895 F.2d 1073, 1078 (5th Cir.1990)).

Additionally, the court finds it appropriate and necessary to hear from the parties at trial.
Although there may not be material facts in dispute, the court believes it will benefit from hearing
from live witnesses as opposed to considering cold transcripts of their respective depositions.  This
will afford the court the opportunity to adjudge credibility and consider what context the testimony
may place upon the parties' relationship and communications during the relevant period.

Finally, the court cannot say at this phase of the proceeding that the Plaintiffs are entitled
to relief as a matter of law.  The evidence in the record shows that, upon the Plaintiffs' default, the
Defendant proposed to utilize the deed in lieu of foreclosure on three possible occasions; although,
of potential significance, two of those occasions were communications to the Plaintiffs' counsel
and, according to the Defendant's contentions, were in furtherance of fashioning a resolution to
the dispute between the parties.  (Doc. #87-3, Ex. R.)  The Defendant did not commence a
foreclosure until 2017 such that threats to record the deed in lieu of foreclosure may constitute
conduct prohibited by § 46A-2-124.  The Defendant is not able to negate this basic fact with any
evidence.  Notably, however, the court cannot say at this phase of the case that the deed of trust
and associated foreclosure procedures were the exclusive way in which the Defendant could
vindicate his interest in the property.  In that regard, the 2008 Contract was not a traditional lending
arrangement involving three parties: a seller, a buyer, and a lender.  In that instance, the lender's
only interest in the property is as collateral for the promissory note.  The lender can therefore only
vindicate its interest by foreclosing consistent with state law.  The dispute here, however, arose
from a seller-financed transaction, and the court is unsure what impact, if any, that has upon its
application of the law.  For instance, it is true that the Defendant took a deed of trust to secure the
Plaintiffs' payment under the 2008 Contract, but the court is unsure whether that was the
Defendant's only recourse vis-à-vis the subject property upon the Plaintiffs' default.  If it was,
perhaps the Plaintiffs are entitled to judgment as a matter of law.  If, however, the Defendant had
an interest in the property to vindicate by virtue of enforcing the note and deed in lieu of

foreclosure, perhaps he is not liable for unfair or unconscionable debt collection. Neither party addressed these aspects of the transaction, and thus post-trial briefing on the issue will likely be necessary.

Based upon the foregoing, the court will deny both motions for summary judgment regarding Count VI.

### G. COUNT VII

In Count VII, the Plaintiffs contend that the Defendant violated § 46A-2-128(e) by contacting them at least three times directly after the Plaintiffs sent an October 1, 2015, letter to the Defendant's principal place of business indicating that they were represented by an attorney with respect to the debt at issue. The applicable WVCCPA provision provides:

> No debt collector may use unfair or unconscionable means to collect or attempt to collect any claim. Without limiting the general application of the foregoing, the following conduct is deemed to violate this section: . . . .
> (e) Any communication with a consumer made more than three business days after the debt collector receives written notice from the consumer or his or her attorney that the consumer is represented by an attorney specifically with regard to the subject debt. To be effective under this subsection, such notice must clearly state the attorney's name, address and telephone number and be sent by certified mail, return receipt requested, to the debt collector's registered agent, identified by the debt collector at the office of the West Virginia Secretary of State or, if not registered with the West Virginia Secretary of State, then to the debt collector's principal place of business. **Communication with a consumer is not prohibited under this subsection if the attorney fails to answer correspondence, return phone calls or discuss the obligation in question**, or if the attorney consents to direct communication with the consumer. Regular account statements provided to the consumer and notices required to be provided to the consumer pursuant to applicable law shall not constitute prohibited communications under this section;

W. Va. Code § 46A-2-128 (emphasis added). The parties have filed cross motions for summary judgment on this count and are not in disagreement as to the underlying fact that the direct communications occurred. Rather, the parties disagree over the applicability of the exception permitting direct contact.

Counsel for the two parties apparently communicated by phone or letter on October 14, 2015, and October 30, 2015, and one additional unspecified date within that period (but at some point between October 19 and 23). Between the two specified dates, the potentially prohibited direct communications occurred on October 21, 27, and 28. The Defendant refers to a letter in which Mountain State Justice acknowledges a delay in getting back to him and claims that the

delay necessitated the exception, although it doesn't clearly indicate when the delay occurred or its duration.  (Doc. #89, Ex. 18.)

The statute does not clearly delineate how long a communication sent to an attorney must go unreturned before the exception applies and whether the type of communication makes any difference, which renders any determination thereunder largely factual.  The confusing series of communications during October 2015 certainly could be subject to different inferences and interpretations, and further evidentiary development would be helpful to the extent testimony could clarify 1) how much delay occurred before the Mountain State Justice attorney followed up with the Defendant or his attorney and 2) how urgent were the issues raised in the communications sent to the Mountain State Justice attorney for the Plaintiffs.  *Cf. Ferrell v. Santander Consumer USA, Inc.*, 859 F. Supp. 2d 812, 816–17 (S.D. W. Va. 2012) (denying motion for summary judgment on a 2-128(e) theory as a result of evidentiary disputes).

For the foregoing reasons, there are disputed issues of material fact, and the court must deny both cross motions for summary judgment on Count VII.

## IV. CONCLUSION

The court will enter an order DENYING the Defendant's motion for summary judgment as to Counts I, IV, V, VI, and VII, with the condition that the only issue to be tried on Count V is whether West Virginia Code § 46A-3-112 governs the 2008 Contract and whether a violation thereof, if one is found, constitutes a violation of § 46A-2-127(g).  The court will enter an order GRANTING the Defendant's motion for summary judgment as to Counts II and III.

The court will further enter an order DENYING the Plaintiffs' motion for summary judgment as to Counts II, IV, V, VI, and VII, with the condition that the only issue to be tried on Count V is as previously stated.